Good morning, Your Honors. May it please the Court, Carrie DeVito for Defendant and Appellant Walter Benavides. DeVito. Your Honors, the controlling U.S. Supreme Court precedent in this case, which is established in very broad strokes in Chessman v. Keats, is that there's a due process right to the accuracy of transcriptions and translations at trial. And in this case, unfortunately, we have problems with both. The undisputed facts established through my client's declarations to the California Supreme Court on habeas is that there are 235 instances in the transcriptions from the Spanish tape recordings that are either unintelligible, inaudible, or incomprehensible. And then my client also painstakingly went through the transcriptions to translations and found that one translation had errors on all 94 pages and another had at least 131 words and phrases that were not accurate. Well, the thing that struck me is that the translations felt both ways. Some of them were in favor of your client. Some of them could be interpreted as in favor of the government. So that it wasn't one-sided, so which leads me to ask the question, what's the prejudice here? Well, Your Honor, to say that the errors fell both ways, I understand that it's very seductive to think that there could be no prejudice from that. And I understand that the magistrate judge felt that way because she said some of these errors benefited Mr. Benavides. If we look at it from a point of view of some of these errors benefited him, it substantiates why there was ineffective assistance in this case. Because if trial counsel was aware that there were errors in the transcript that helped my client, counsel should have had a professional translation done independent from the court's translation to find out whether there were any other aspects of these translations that were beneficial. He failed to do that. In addition, the magistrate judge said, but the inaccuracies in the transcripts were brought out to the jury because the officers testified about them. Again, although this part of the error falls against Mr. Benavides, again, it substantiates why there was ineffective assistance here. Because if trial counsel was aware that there were errors that harmed Mr. Benavides' case, again, it behooved trial counsel to find out exactly how many of those errors were and bring all of them in before the jury. So what we wind up with here So the tapes were in Spanish. The real evidence is the tapes. And the jury couldn't listen to the tapes because they wouldn't understand it. You had to have a translator. Didn't the Court appoint an expert to translate, an independent expert to translate the tapes? Well, the Court appointed a court translator. I don't – I would not call them expert necessarily. One of the things Mr. Benavides said in his habeas corpus petition is that it appears the translator didn't speak the dialect of Spanish, but these witnesses did. And there were some idiosyncratic translations that were incorrect. I just want to give the Court a quick example of why it would have been critical in this case to tell the jury that even though they could not rely on the tapes themselves, they had to rely on the transcripts, the tapes were the evidence, the transcripts were not. The example I want to give is that in Spanish, the word por qué, it's both a phrase and a single word, and it means exactly opposite things. When you say por qué to somebody, you're asking why. When that person answers you, they say por qué, and they're explaining because. Unless you listen to the tone in which something is said, you can't tell whether por qué is an interrogative or declarative or something else. And in this case, because there were so many gaps in the translation, it appears the interpreter who – I'm sorry, so many gaps in the transcription, it appears the interpreter started to fill in those gaps to try and put some of these answers in context. That's – Now, we're talking about the transcripts, the errors in the transcripts here. Your Honor, there are errors in both. There were errors in the transcription from Spanish to the written page. Yeah. And then there were errors in the translation from the transcribed Spanish to the translated English. There were errors in both. But we're talking about the written documents. The written document that the jury relied on, of course, is the English translation. What was provided to them were side-by-side columns. One had the Spanish, one had the English. But these transcripts under California law were not the evidence. The tapes were. Well, yes, but what I was beginning to hear is that the witnesses were in this case. They were live witnesses. So doesn't that minimize any possible fallout effect with respect to discrepancies in the transcripts? Well, at trial, these eyewitnesses recanted their identification. Those of them who made identifications of my client as a shooter or participant recanted the identifications. One of these witnesses not only recanted an identification as to one murder, he also recanted that my client made a hearsay statement against penal interest to him as to another one of the murder victims. The recantations at trial are impeached by these transcripts. And an indication of how much the jury relied on them is that the jurors requested the transcripts during their deliberations. That shows up in the trial court record, clerk's transcript, page 161. The jurors are reading these transcripts as though the transcripts were evidence, and they weren't. They were only the court transcribers and then the court translators' interpretation of what the actual evidence was. The transcript and the translation, both are replete with errors. If the jurors didn't listen to the tapes, they had no way of knowing the tone in which something was said, the context in which it was said. And so one of the examples that's given in the opening brief is that Mr. Reyes identified my client from a photo six-pack. The transcription and the translation make it appear as though he did so seamlessly while talking to a police officer. It just goes line, line, line, line, line. But when you listen to the tape, there's a rather long gap of silence there. And there was a suggestion at trial that either the police officer who was presenting the six-pack to Mr. Reyes, either the officer coached him. There was a suggestion that a circle drawn around my client's picture might have been there before Mr. Reyes made the identification. And then Mr. Benavides, in his competing transcript that he provided to the State courts, pointed out there's a whole block, a whole exchange that doesn't appear in the official transcription or translation in which Mr. Reyes appears to be saying, no, no, I don't agree with, and he's cut off by Officer Sandoval who says, no, go ahead and do what you're going to do. And it seems as though Mr. Reyes is about to say either I don't agree with that identification or I don't agree with what you're saying I'm saying, but he's cut off from saying anything else. And none of that appears in the transcripts. So the prejudice is, how can this jury accurately assess Reyes' or Roldown's credibility recanting these identifications at trial or their credibility making these identifications on the tape recordings in the first place? How can the jury really test the officer's credibility when the officers say, yes, there are errors in the transcriptions and translations, but for the most part, what you are provided on paper accurately tracks what we were told there? Ginsburg-Millett, which should have been done in your view, given what should have been done in your view? Are you suggesting that the appropriate procedure would have been to play the tape and have it simultaneously translated for the jury? I have actually never seen that done at trial, Your Honor. I think then there would be a due process notice problem for the defense if that were done. But I think if the jury was told that while reading along, they should also pay attention to the tape because the tape was the evidence, that might have been appropriate. I suspect what happened here is that these English literate jurors did the easiest possible thing, which was simply read the transcript, even if the tape was being played, and they weren't paying attention to, as I said, the tone and potentially the context within which something was said. Again, the reliance on the transcript is that the jury asked that those transcripts be given to them during their deliberations. They did not ask that the tapes be played again. They asked for the transcript so they could read what they thought was the testimony in this case. I just wanted to briefly mention in terms of the ineffective assistance, there's been a suggestion that Mr. Benavides had a duty to tell his attorney at the time of trial about these inaccuracies because this issue, of course, arose on habeas corpus in the State court. It did not come to the trial court's attention. But there's no suggestion in the record that Mr. Benavides had a copy of these inaccurate transcripts in front of him at the time the Spanish-language tapes were played. Because Mr. Benavides is bilingual, I suspect what happened is he sat there at trial and listened to the tape and could hear what was being said, but did not know at the time that the jury was reading something that was wildly different than what the tapes were saying. He brought it to his counsel's attention as soon as he could, which was after his conviction on direct appeal, presumably as soon as he noticed the inaccuracies, and he told his appellate counsel about it. When appellate counsel wouldn't do anything about it, Mr. Benavides provided the State court of appeal with a procur supplemental brief, and then the State court of appeal deferred that until the habeas corpus was seen later on. I'm going to reserve the rest of my time for about a minute. Roberts. Roberts. Counsel, before you do that, and stop the clock, please. We have received from your client a document called Petitioner prays to this Honorable Court to consider this brief in adjudication of his appeal. It was delivered to us apparently on Monday. I take it you haven't seen it? No, no. My client sent me a copy of it, Your Honor. Oh, okay. All right. I believe what he's asking the Court to do is look at some further examples he's providing the Court of distinctions between the transcripts and the reality of the tape. All right. Further inaccuracies. Is there any reason why we shouldn't reject the filing, since you've already filed a brief and our rules are quite clear on that subject? Your Honor, in both the opening and reply briefs, I offered the Court the opportunity to look at Mr. Benavides' competing translation with the official court translation. I have those copies standing ready if the Court feels it necessary to look at them in order to rule on this case. Mr. Benavides just wanted to bring to the Court's attention, I only cited three examples in the opening brief of what I thought were the most egregious problems with the translation. Mr. Benavides has pinpointed 200 or so. And he wanted the Court to be aware there weren't that many more. Thank you, counsel. Thank you. We'll hear from the government. Good morning, Your Honors. Deputy Attorney General David Cook for Respondent. I have not received a copy of the brief that you have just mentioned. I'm not sure what the proof of service says, and I know that there's sometimes a delay between docketing, receiving a document, and it being conveyed to my personal office. However, I have not seen this brief from Mr. Benavides personally. Moving on, I just have a few comments to make. First of all, counsel, for Petitioner has mentioned the apparently several or many inaudible or unintelligible sounds on the tape. And if such – if the tape itself were excluded, all we would be left with at trial would have been the officer's testimony regarding the interview, as well as the testimony of the witnesses who were interviewed. None of – and as the district court's judgment makes clear, they were all consistent in the identification and the testimony about the events surrounding the two murders. Well, on the Muerta murder, you have the – you have independently by Lopez an eyewitness ID. On the Lil-Rata murder, what, in addition to the prior and consistent statements of Roald Dahn, did the government introduce? Well, as far as the murder of Juan Vialta, is that Lil-Rata? Well, Roxana Roald Dahn had given written statements to the police as well, identifying Petitioner as the shooter and testifying as – or I should say, a written statement where she says that there was a confrontation between Petitioner and the victim and maybe others. That Petitioner was armed, had a gun pointed at the victim, at which point Ms. Roald Dahn left the scene, but immediately thereafter heard a shot, which was also consistent with her – with her other statements. And again, the officers testified consistently with that story. The translation of the tape, the – even – and the district court made this clear. Even if you were to assume that Petitioner's competing translation of the interviews were correct or was correct, there was nothing material in any differences or errors, so to speak, that would result in either a due process violation having occurred or, in relation, IAC having occurred. But what if the statements in the tape were not truly inconsistent? You know, they're not prior inconsistent testimony, but rather they're consistent, then they wouldn't have been admitted at all. I'm sorry. I'm not following. These statements that were used from the translation, which the Petitioner thinks has double error in it, they were admitted as a prior inconsistent statement. Right? Are you talking about the state – oh, the statements made at the interview. Yes. Right. Okay. Prior inconsistent statement. Well, suppose that they – that they are not, in fact, inconsistent statements, but rather because of the translation just were made to appear inconsistent, then those statements never would have been admitted, right? Well, to the extent statement – well, I guess I'm not quite following Your Honor's question, but if – They couldn't be used to impeach the witness's testimony. Well, the witnesses – at trial, the witnesses didn't deny the fact that these statements were made during the interviews. They recanted their statements, which was the basis for the prior inconsistent statements from the interview being admitted at all. Does that answer your question, Your Honor? In other words, there's nothing about the interview statements themselves that they're – it's not the interview statements that brings up the prior inconsistent statement aspect. It's that the witnesses at trial recanted their – recanted those statements. But what if they hadn't said them and the transcript was inaccurate in that respect? Then it wouldn't be a recantation, would it? Well, the recantation was done at trial, not during the interview. But if – but I see, Your Honor, if in fact the state – if in fact the witnesses had said something completely different than what was purported in the translation, I would – depending on what the witness actually said at the interview, then yes, there's an issue of whether it is inconsistent or not. And right now we just have the petitioner's word versus the translation. Well, a court appointed translator, and again, looking at the competing translation that petitioner offered, there's nothing of a material nature in the errors, even if you assume his competing translations are correct. And those arguments were set forth in the brief, in my brief. For example, one of those examples that opposing counsel talked about was the matter of – on one of the photo identifications that petitioner's photograph was circled. However, and if you look at page 49 of the appellee's brief, you'll see Mr. Reyes testified himself that he circled that picture. And so to the extent that there is any error in the translation of the transcript, the record bears out that Mr. Reyes circled the picture, not the police or no one else. Opposing counsel also made – was referring to the point that the jurors were not listening to the tape itself, that they were somehow focused on the translation. Well, because the jurors were not – you know, because the language used in the trial was that of English and there was no showing that the jurors were fluent Spanish speakers, it doesn't – it's not surprising that they would rely on the English translation. However, at trial, the tape was heard. And to the extent the jurors wanted to consider the transcripts in their deliberations, they were certainly free to listen to the tapes again, but in their opinion, which is certainly their right and purview, they didn't feel the need to listen to the tapes again. Another point that should be mentioned here, Your Honors, is that the defense attorney at trial hired an investigator after the translations were made. That investigator interviewed the witnesses, and there was no showing that they disputed the accuracy of the translation. In fact, the witnesses at trial never disputed the accuracy of the translation of the police interview. And to the extent Petitioner, who is a Spanish speaker, was sitting in trial, heard the tape being played, he also did not dispute the accuracy of the translation at the time. Now, it may not be Petitioner's burden – well, Petitioner bears the burden of establishing ineffective assistance of counsel. And to the extent that he didn't complain at the time shows that it impacts his credibility as to the accuracy of his competing translation, or at least in the sense that there is no material error that occurred in the translation itself. As Your Honors pointed out also, to the extent that there were some errors, some of those errors benefited Petitioner, and those were brought up by defense counsel during cross-examination. Your Honors, I have nothing further to add than what's already in the brief. Thank you, counsel. Thank you, Your Honors. Ms. DeVito, you've reserved some time. The parties seem to have a serious dispute here as to whether or not any of these inaccuracies are prejudicial or important or relevant, but I want to point out to the Court that just one of the three examples I gave the Court in the opening brief has to do with Ms. Roldan's statement to the police. And it's at page 28 of the opening brief, if the Court cares to look at it later. In the official translations, Ms. Roldan, who apparently is looking at a photo lineup, is quoted by the translator, the transcriber, whoever, as saying, it's this one. Tell which one is, because Shadow, I tell you, is this one. Shadow, by the way, is my client's nickname. But in Mr. Benavides' competing translation, which was interpreted directly from the Spanish language tape and not from the Spanish transcription of the tape, Mr. Benavides has Roldan actually saying, is this the one? Tell me which one it is. If it's not him, or is it Shadow? In other words, she's asking a question. She's not stating declaratively that it is Mr. Benavides, and she's asking the officer for a clue as to who to identify. Roberts, did you say page 20? 28, Your Honor. Oh, 28. I'm sorry. And it's the middle two full paragraphs in which I compared the two. If that's the sort of disagreement that goes on between Mr. Benavides' translation and the official court reporter or court interpreter translation, those are hugely significant. This is not a positive identification. This is a cooperative eyewitness seeking to please a police officer. And the fact that the witnesses did not dispute the translations at trial, I think, means very little. These witnesses were all very busy recanting their testimony and denying they had been present in the first place and claiming they only said what they said because they were seeking deals on their own criminal charges. Again, the fact that Mr. Benavides didn't protest the inaccuracy of the translation at trial very well may be due to the fact that he did not have a copy of the inaccurate transcript in front of him. And finally, Your Honor, I wanted to make one more point. In the opinion, the magistrate judge said the officer's testimony was consistent with the trial transcripts, and therefore, she did not necessarily see that there was prejudice in this case. The point I want to make is if the translation of the transcripts was incorrect in the first place, then it's irrelevant that the officer's testimony at trial was consistent with the incorrect translations. I know that sounds a bit convoluted, but it comes down to the officers could have We have to rely, to follow your argument, we have to rely on Benitez's translation of the tapes. At this point in time, yes, Your Honor. But the State did not dispute the accuracy of Mr. Benavides' translation either. And the State had the opportunity to do so throughout the habeas corpus process in the State courts. In addition, Mr. Benavides provided his own translation to the State courts and also to the district court and asked the State court of appeal and the State supreme court and the district court to provide him an evidentiary hearing so that he could get a proper court-authorized competing translation. He wasn't given that opportunity. So to the best of Mr. Benavides' ability, he's evidenced for this Court that there are those errors. Does the Court have any further questions? No further questions. Thank you, counsel. Thank you, Your Honor. The case just argued will be submitted for decision, and the Court will adjourn. All rise. Hear ye, hear ye. All those who have had evidence before this Honorable Court to match the importance of the Ninth Circuit shall not depart. The Court stands adjourned. We'll have a nice flight back.
judges: O'scannlain, Wardlaw, Lovell